Filed 9/18/23  P. v. Young CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>BRIAN YOUNG,<br><br>　　Defendant and Appellant. | A164845<br><br>(Contra Costa County<br>Case No. 50811471) |

　　Brian Young was convicted by a jury of second degree murder (Pen. Code, § 187; all further statutory references are to this code) and was sentenced on that conviction.  Young sought resentencing under section 1172.6.[1]  After issuing an order to show cause on Young's petition and conducting an evidentiary hearing, the trial court found the People had proven beyond a reasonable doubt that Young could still be convicted of second degree implied malice murder and denied his resentencing petition.  We affirm.

---

[1]　　Effective June 30, 2022, the Legislature renumbered section 1170.95 to section 1172.6, with no substantive changes in the statute.  (Stats. 2022, ch. 58, § 10 (2021–2022 Reg. Sess.)  Throughout this opinion, we cite to section 1172.6 for ease of reference.

1

The procedural summary through Young's 2011 trial and direct appeal is taken from our prior opinion in Young's direct appeal (*People v. Young* (Mar. 28, 2014, A134248) [nonpub. opn.] (*Young I*)) and our more recent opinion on Young's petition for resentencing at the prima facie stage (*People v. Young* (Mar. 30, 2021, A159116 [nonpub. opn.] (*Young II*)).

The factual summary, however, is based on the evidence adduced at Young's trial which was considered by the trial court and is limited to those facts relevant to the issue on appeal, namely, whether the trial court erred in denying Young's section 1172.6 resentencing petition.[2]

## *General Overview*

On the evening of April 3, 2008, a Dodge and a Pontiac were traveling westbound on Interstate 80 through Pinole. The Dodge was being driven by Tiana Sheppard; her boyfriend Aaron Myers was in the front passenger seat and their friend Young was in the rear seat. The Pontiac was being driven by Rhonda White, who was a good friend of Sheppard and a close friend of Myers and Young. Also in White's car were D., S., C., and A., mostly all of whom knew and were friends with Sheppard, Myers and Young. White, D., S., C., and A. were out for the evening, headed for a bowling alley.

At some point while driving on the freeway, White or D. recognized Sheppard's Dodge. White moved to get closer and then White waved and D. flashed peace signs to the people in the Dodge. Multiple shots were fired from the Dodge into the Pontiac. White was killed, and D. – seated in the front passenger seat – was wounded.

---

[2]     For the purposes of our analysis, we, like the trial court, do not take from or rely on the factual histories set forth in either of our prior opinions. (See *People v. Clements* (2022) 75 Cal.App.5th, 276, 292–293.)

Sheppard and Myers were charged with the same offenses as Young: murder (White) (§187) and attempted murder (one count per passenger in White's car) (§§ 187, 664), with related firearm enhancements (§ 12022.53, subds. (b)–(d)), and shooting at an occupied vehicle (§ 246). Sheppard entered into a plea agreement. Myers was tried and found guilty of one count of voluntary manslaughter and four counts of attempted voluntary manslaughter, together with a firearm enhancement and shooting at an occupied motor vehicle. Myers' conviction was affirmed on appeal.

Young's jury trial took place in October 2011.

### *Relevant Testimony from Select Prosecution Witnesses from 2011 Trial*

### *Tiana Sheppard*

Sheppard testified that White was a good friend whom she had known for seven years, having met her through Myers, her ex-boyfriend. White and Myers had been neighbors; the backyards of their childhood homes abutted. White was the godmother of Sheppard and Myers' eldest child.

On the evening White was killed, Sheppard had picked up Myers and Young in Sacramento in her Dodge. Myers had a backpack, which he placed in the trunk, before getting into the front passenger seat. Young had a dark-colored duffle bag, roughly three feet long, which stayed with him in the backseat. Sheppard did not see Myers, who was seated next to her in the car, with a gun or a rifle. She did not see if Young (seated in the backseat) had any weapon either, noting she did not really look in the backseat during the drive. Sheppard never looked inside the duffle either.

It was close to 9 p.m. and getting dark outside as they made their way to Richmond via Interstate 80. As they prepared to exit the freeway, a car pulled alongside her car. Sheppard looked over but could not make out any faces, only shadows. She was startled but did not see anything that was

3

threatening. She did not recognize the car as her friend Rhonda White's Pontiac.

Myers asked her about who was in the other car and Sheppard responded that she did not know. Nothing inside the other car appeared threatening to her, nor had the car swerved into her lane or cut her off. Myers suddenly told Sheppard to "watch out" and grabbed her head and pushed it down. Sheppard next heard "shots and glass and a boom." She had no idea where the shots were coming from as she kept her head down the entire period. Nor was she able to tell whether two different types of shots were being fired. She just heard glass shatter and felt glass flying. She never felt anything on her body consistent with a rifle being set on top of her.

After they pulled over, the trio got out of the Dodge, crossed a freeway railing, and walked to the top of an adjacent slope. Young had a jacket over his shoulder. Sheppard could see something hanging out from under his jacket that looked metallic and like the end of a pole but was not sure what it was. She had previously seen rifles, and the object could have been the barrel of a rifle. They left the scene not knowing who, if anyone, had been shot.

**C.**

On the evening White was killed, C. had planned to go bowling with White, D., S., and A.; White was driving. He sat behind White, while D. was in the front passenger seat; S. sat in the backseat behind D., and A. occupied the middle backseat. On the way to the bowling alley, White recognized Sheppard's Dodge. When White caught up with the Dodge, C. recognized Sheppard driving and Myers in the passenger seat. C. could also tell someone was in the backseat of the Dodge but could not identify who it was.

4

When White pulled up parallel to Sheppard's Dodge and their cars were "neck and neck," White waved. After White waved, "[t]hey started shooting." C. saw a muzzle flash from the front of the car. He ducked and everybody in the backseat crouched down too, while D. in the front seat slid down. He heard over 20 shots. D. exclaimed he was hit, and White tried to gasp for air but soon after went quiet. Eventually, S. figured out how to take control of the Pontiac and managed to pull the emergency brake to bring the car to a stop. C. checked on D., who was slumped down in the front seat, could not move, and stated, " 'Don't let me die.' " White did not say anything and appeared stiff.

With respect to the gunfire, C. stated that he heard two different guns. First, he heard a handgun associated with the front passenger seat from where the initial shots were fired. He explained that he had previously heard handguns being fired and was aware they sounded different from assault rifles. Two or three seconds after four or five shots from the handgun were fired, he heard rapid fire shots which sounded like they came from a fully automatic machine gun. He did not see any shots coming from the backseat of the Dodge, since he was down at the time. At Myers' trial in 2009, C. had testified that he could not tell from the sound of gunfire whether there was one weapon or two. He acknowledged that since the 2009 case, he had heard that two separate casings were found as part of the investigation.

**S.**

S. testified that on the evening White was killed, he and his friends were in White's car on the way to a bowling alley. He was in the backseat in the middle, while C. was to his left behind White, and A. was to his right behind D. At some point on the freeway, D. recognized another car. S. was able to see Sheppard's face clearly but could not make out the other two male

5

passengers.  He could see the person in the backseat moving around.  As soon as White waved to the car, the shooting started.  S. saw lights from the firing of a weapon.  After the first few sparks, he put his head down.  There were more than 10, possibly more than 20 shots fired.  When they exited the car, he saw more than 20 shots had been directed towards them. He could not tell if he had heard multiple types of gunfire.  Once the shooting stopped, S. sat up, grabbed the steering wheel, and slowed the car down.  There were no weapons in White's car that night.

### D.

D. testified that on the night White was killed, he and his friends were in the carpool lane of the freeway when he noticed Sheppard's car.  When D. looked over at the Dodge, he could clearly see Sheppard driving, Myers in the front seat, and Young awake in the backseat behind Sheppard.  D. gestured a peace sign to them with both hands.  Myers looked over at Sheppard and within a few seconds he lifted a gun and was shooting.  D. saw a muzzle flash from the front seat, indicating shots initially coming from Myers.  In a span of two or three seconds, he saw another muzzle flash from the backseat and heard gunfire.  The gunfire was loud, and the shots all sounded similar.  Based on the sounds, he could not say if there were multiple types of guns.

In response to the shots, D. ducked to the side and moved towards White after seeing more muzzle flashes.  He felt bullets strike him.  Following the shooting, he was in a coma for a month.  D. stated that prior to the shooting, no one in his car (the Pontiac) had acted angrily towards the people in the Dodge.  There were no weapons in the Pontiac, and he never saw any of his friends with a gun.

***Detective Michael Pistello***

Detective Pistello of the Pinole Police Department investigated White's murder and went to the crime scene the night White was killed. Inside the Dodge (Sheppard's car), he saw several expended casings, including a .380 shell casing and another 7.62x39mm rifle shell casing. As to the Pontiac (White's car), he saw 14 bullet holes in the passenger side of the car, all passenger windows shattered, and a small amount of blood in the vehicle. He did not observe any weapons in the Pontiac.

Detective Pistello interviewed C., S., D., and A. (the surviving passengers of the Pontiac). He first interviewed C. the night of the shooting, but C. was shaken up and reluctant to talk. C. returned to the police department the next day and, while still hesitant, was more willing to talk. C. told the detective the following: The car involved in the shooting belonged to Sheppard and Myers and he knew the car from the neighborhood. Sheppard was the driver, Myers was in the passenger seat, and Young (whom C. had only known and identified by his nickname Bow Wow) was in the backseat. He was able to see the gun Myers had and demonstrated how Myers held the gun prior to shooting it, holding his right hand from his shoulder area, and using his index finger on a trigger. He used only one hand for the demonstration. He was unable to describe the gun, however, because he could not see it. Detective Pistello did not ask C. if he could tell if the weapon was a handgun or a rifle because, based on C.'s motion, he knew one did not shoot a rifle in that manner and it was clear in his mind he was describing a handgun. He did not recall asking C. if he saw anyone else shoot a gun from the back of the car.

After Sheppard surrendered to police, she told Detective Pistello the following: She was present during the shooting and had been driving the

Dodge. She first saw Young's firearm as they were fleeing the scene. They were running up a hill and when she looked up and saw Young had a gun slung over his left shoulder, underneath his jacket. She saw the nose of the gun hanging from beneath the jacket and estimated with her hands that it was 2.5 feet long. She remembered Young having the gun because his was "the bigger gun." She did not use the term "rifle" when discussing the firearm, referring to it as a "gun." Detective Pistello had referred to the firearm as a "rifle," but Sheppard never corrected him or stated it was not a rifle.

Detective Pistello met D. briefly at the hospital the month after the shooting. There, a nurse provided him a plastic container with an expended round from what the detective suspected was a 7.62x39mm rifle round, which was marked as People's exhibit 11a. He learned the round had been removed from D. during surgery and sent it to the county crime lab for analysis.

### Deputy Sheriff Donald Finley

Deputy Sheriff Finley, a criminalist at the Contra Costa Sheriff's Crime Lab, was designated a firearms expert. In processing the Dodge for evidence, he did not find any firearm in the car but did locate multiple cartridges from two different calibers of firearms. There were two expended .380 cartridge cases which were likely fired from an automatic pistol and located in the front of the vehicle, and fourteen expended 7.62x39mm cartridge cases which were likely fired from an AK-47 assault rifle and located throughout the inside of the vehicle. It was impossible to say with certainty whether any particular cartridge case was fired from the front or back of the car. One of the 7.62x39mm cartridge cases was found inside the unzipped green duffle behind the driver's seat. He explained that .380 cartridge cases are fired

from small pistols or handguns, while 7.62x39mm cases are typically fired from rifles, most commonly AK-47s.

Deputy Sheriff Finley reviewed the damage to White's Pontiac from the gunfire. All four passenger windows of the car were shattered. There were also 13 bullet holes in the passenger doors and apparent bullet damage inside the car as well. Generally, it was not possible to determine the caliber of the bullet that created the damage, i.e., a particular hole in the car, so they looked at actual recovered bullets to determine the caliber. For instance, he found at least three, possibly four, .380 bullets lodged inside the front passenger door which did not penetrate the door completely. There were also bullet fragments found under the front passenger floor carpet which appeared to be from a rifle. He also determined that another bullet which the crime lab received from the Pinole Police Department, marked as People's exhibit 11a, had been fired through a rifle.

### Dr. Ikechi Ogan

Dr. Ogan, a forensic pathology expert, conducted White's autopsy. He testified that White died of multiple gunshot wounds. Based on the size of the entrance wounds, he could not identify the caliber of bullets which caused the wounds. He returned recovered fragments from the bullets to the police.

### Relevant Testimony from Select Defense Witnesses from 2011 Trial

### Brian Young

Young testified that he had known White for nine years, they lived in the same neighborhood, and she was like a sister to him. He was also friends with D. and C. and knew S. through the neighborhood.

On the night White was killed, Sheppard had picked up him and his best friend Myers from Sacramento and they planned on driving to Richmond so that he and Myers could visit their fathers. They made the visit at night

because they did not want to run into trouble. He suspected they might run into trouble because Myers had been shot approximately two months earlier, and he and Myers had been threatened. The day after Myers got shot, someone shot at him. He thought he was a target because others might think that he was intent on retaliating for his best friend.

Sheppard drove, Myers sat in the passenger seat, and he was in the backseat behind Myers next to a baby seat that was behind the driver. Before the shooting, he was dozing and was awakened by Myers sating, "[W]ho is that?" and "[W]atch out." He then heard gunshots and glass hitting; he believed they were being shot at from another car, and he was scared for his life. He was armed with a handgun, 9mm .380, which was on his right hip, and he reached for it. He chambered a round and fired as he was going towards the window with his head down in the car seat. He fired towards his left, towards the car be believed was attacking them, but could not see the car or what he was shooting since his head was down. He was not trying to kill anyone in particular; his only intention in firing was to get the car to back away. Their car hit something, and a tire went flat. He got out of the car, taking his gun with him. He did not see any other gun in the car at the time. Later, after he had left the scene, he learned White had been shot. Had he known who the occupants of the Pontiac were, he would have never shot at the car. Young owned the duffle bag found in the backseat of the Dodge. He acknowledged that the digital scale found in the bag was his and that marijuana residue was on the scale. He used marijuana but did not sell it. Myers sold marijuana.

On cross-examination, Young acknowledged he was a felon at the time of the shooting and had previously been convicted of having a firearm on school grounds. As a felon, he was aware that he was not allowed to have a

10

firearm and that carrying one was against the law. He also knew Myers was a drug dealer and kept firearms at his house, from where he sold drugs. On the night Sheppard drove him and Myers to Richmond, he was aware that Myers was transporting marijuana to Richmond.

On the night of the shooting, Young had no idea the color of the car he shot at, as he recalled only seeing the outline of the car. He had not seen White or D. in the car and never saw White wave. He pointed his handgun in the direction of the car next to them but did not aim it at the people inside, intending only to scare them off. He did not remember how many shots he fired or how many times he pulled the trigger. Nor did he know if Myers was also firing a gun since his head was down, but he was aware of other gunshots. At the time, he really believed someone was firing at him and that he was in danger, even though subsequent reports have since made him realize that was not the case. He also admitted to being awake.

Young wore a jacket that night but indicated it stopped at the waist so was not long enough to conceal a rifle. Any rifle would be visible underneath his jacket. Sheppard never saw him with a barrel hanging underneath his coat. He did not have a metal pole with him either. He denied that a rifle was in his duffle when he brought it inside Sheppard's car. He denied firing multiple rounds from an AK-47 into White's car.

After the shooting, Young fled to Louisiana because he feared prosecution as well as retaliation by the families of the victims. He did not return to California until he was captured nine months after White's death.

### *Verdict and Sentence*

The jury convicted Young of shooting at an occupied motor vehicle (§ 246) and second degree murder (§ 187), together with true findings on the firearm enhancements (during the commission of the murder defendant (1)

11

personally used and discharged a firearm; and (2) personally and intentionally discharged a firearm causing great bodily injury or the death of the victim (§§ 12022.5, subd. (a); 12022.53, subds. (b)–(d)) and the sentence enhancement (killing perpetrated by intentionally shooting a firearm from a motor vehicle at a person outside the vehicle with the intent to inflict great bodily injury (§ 190, subd. (d)). The jury was unable to reach a verdict on four counts of attempted murder; those counts were later dismissed. Young was sentenced to an aggregate term of 50 years, later modified to 73 years to life by the trial court.

## Direct Appeal

On direct appeal, Young did not challenge the sufficiency of the evidence but instead argued purported instructional and sentencing errors. We affirmed the conviction but remanded the matter for resentencing. The Supreme Court denied Young's petition for review. (July 14, 2014, S218266.) Young was resentenced to an aggregate term of 45 years to life.

## Resentencing Proceedings

### Prima Facie Stage

On February 20, 2019, Young, appearing in propria persona, filed a section 1172.6 form petition for resentencing. On the form petition, Young averred that: (1) an information was filed against him that allowed the prosecution to proceed under a theory of murder based on "the natural and probable consequences doctrine"; (2) he was convicted of second degree murder; and (3) he could not now be convicted of second murder because of changes to section 188, effective January 1, 2019, together with representations that he was not the actual killer and did not, with the intent to kill, aid or abet the murder. He attached to his petition several documents, including certain jury instructions and our *Young I* decision. The

12

trial court appointed counsel for Young, and both Young's appointed counsel and the People submitted additional briefing and portions of the trial testimony transcript.

On September 10, 2019, the trial court summarily denied the petition without issuing an order to show cause or holding an evidentiary hearing. The court found Young was not entitled to relief because he had not made a prima facie showing that he could not be convicted of murder under the new law. Young appealed.

We concluded the trial court erred in summarily denying Young's resentencing petition without issuing an order to show cause and holding an evidentiary hearing. (*Young II*, *supra*, at p. 12.) In particular, the trial court erred in finding Young had failed to meet the third condition for a prima facie showing under section 1172.6, subdivision (c), namely, that he could not be convicted of second degree murder under the new law. (*Young II*, at p. 13.) We explained that the trial court had erroneously denied relief by (1) determining at the prima facie stage that there was substantial evidence from which a reasonable trier of fact *could* reach a guilty verdict of implied malice murder; and (2) engaging in judicial fact-finding at the prima facie stage rather than holding an evidentiary hearing. (*Ibid.*)

We reversed the order denying the resentencing petition and remanded the matter to the trial court with direction to issue an order to show cause and to hold an evidentiary hearing under section 1172.6, subdivision (d) to determine whether to vacate Young's second degree murder conviction, recall the sentence, and resentence him. (*Young II*, at p. 13.) We expressed no opinion on how the trial court should rule following the order to show cause hearing. (*Id.* at p. 16.)

*Evidentiary Hearing*

Following our remand, the trial court issued an order to show cause directing the People to show cause why Young's resentencing petition should not be granted and scheduled a hearing. In advance of the hearing, the People submitted a memorandum of points and authorities compiling relevant testimony from Young's 2011 trial, arguing that such evidence established beyond a reasonable doubt that Young could be convicted of second degree implied malice murder and was thus ineligible for resentencing. The People also submitted reporter's transcripts from Young's 2011 trial, as well as photographs of White's damaged Pontiac.

At the hearing, Young was represented by counsel. At the outset of the proceeding, the court noted that, in addition to the trial transcripts, all the exhibits from the original trial had also been transferred to the court. The court admitted the materials as well as the People's additional photographs into evidence and expressed the court's understanding that they were to serve as the evidentiary basis for the court's decision on the order to show cause. The court also heard counsel's arguments. In an oral ruling, the court found the People had proven beyond a reasonable doubt every element of the crime of second degree implied malice murder of White by Young, summarized the trial evidence in support of this conclusion (including discrediting Young's testimony), and denied Young's resentencing petition. Once again, Young appealed.

Young's appointed appellate counsel filed a brief under the authority of *People v. Delgadillo* (2022) 14 Cal.5th 216 (*Delgadillo*) which raised no specific contentions on appeal but suggested we conduct an independent review of the record at our own discretion in the interests of justice. Relying on *Delgadillo*, we informed Young of his right to file a supplemental letter or

brief raising any issues he chose to call to our attention.  Young filed a supplemental brief.

**DISCUSSION**

**I.    Applicable Law**

Effective January 1, 2019, Senate Bill No. 1437 (SB 1437) " 'amend[ed] the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*), superseded in other part by statute, as stated in *People v. Williams* (2022) 86 Cal.App.5th 1244, 1252, fn. 9.)  The Legislature accomplished this in part by substantively amending sections 188 and 189.  (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

Section 188, which defines malice, now provides in part: "Except as stated in subdivision (e) of [s]ection 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Section 189, subdivision (e), now limits the circumstances under which a person may be convicted of felony murder: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [defining first degree murder] in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The

15

person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [s]ection 190.2." (§ 189, subd. (e).)

Effective January 1, 2022, Senate Bill No. 775 (SB 775) expanded eligibility for resentencing relief. (*People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388.) Those eligible for relief now include persons charged and/or convicted of attempted murder under a theory of felony murder or the natural and probable consequences doctrine. (§ 1172.6, subd. (a); *People v. Porter* (2022) 73 Cal.App.5th 644, 650, 651–652 [observing SB 775 amended section 1172.6 to " '[c]larif[y] that persons who were convicted of attempted murder or manslaughter under a theory of felony murder and the natural [and] probable consequences doctrine are permitted the same relief as those persons convicted of murder under the same theories' "].)

SB 1437 also created a procedure for offenders previously convicted of felony murder or murder under the natural and probable consequences doctrine to seek retroactive relief if they could no longer be convicted of murder under the new law. (§ 1172.6, subd. (a); *Gentile, supra,* 10 Cal.5th at p. 843; *Lewis, supra,* 11 Cal.5th at p. 959; *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "[T]he process begins with the filing of a petition containing a declaration that all requirements for eligibility are met [citation], including that '[t]he petitioner could not presently be convicted of murder or attempted murder because of changes to . . . [s]ection 188 or 189 made effective January 1, 2019.' " (*Strong*, at p. 708, fn. omitted.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' " (*Ibid.*) If the defendant has made a prima facie showing of entitlement to relief, "the court

16

shall issue an order to show cause." (§ 1172.6, subd. (c).) Further, the court must hold an evidentiary hearing at which the prosecution bears the burden of proving, "beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder" under state law as amended by Senate Bill 1437. (§ 1172.6, subd. (d)(3).) "If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (*Ibid.*)

Under *Delgadillo, supra,* 14 Cal.5th 216, if a no-issues brief is filed in a section 1172.6 appeal and the defendant then "files a supplemental brief or letter, the Court of Appeal is required to evaluate the specific arguments presented in that brief and to issue a written opinion." (*Delgadillo*, at p. 232.) We are not required to conduct "an independent review of the entire record to identify unraised issues." (*Ibid.*)

## II.   Young's Supplemental Brief Contentions

In his supplemental brief, Young asserts the People failed to prove he was the actual killer since it was never determined that "the [d]eath shot [that killed White] came from [his] rifle." This failure, according to Young, means there was insufficient evidence to prove beyond a reasonable doubt who was White's actual killer. He further notes that Myers "took a plea deal of voluntary manslaughter for being the actual killer, not for aiding and abetting," while Young went to trial and was "found guilty of aiding and abetting [and] for also being the actual killer," which he claims violated his due process. None of these contentions undermine the trial court's denial of Young's resentencing petition.

17

## A. Section 1172.6 Petitions May Not Be Used to Relitigate Decided Issues

As an initial matter, Young may not use the procedures set forth in section 1172.6 to relitigate his conviction or the underlying trial. " 'The purpose of [section 1172.6] is to give defendants the benefit of amended sections 188 and 189 with respect to issues not previously determined, not to provide a do-over on factual disputes that have already been resolved.' " (*People v. Farfan* (2021) 71 Cal.App.5th 942, 947; see also *People v. Coley* (2022) 77 Cal.App.5th 539, 549 [a section 1172.6 petition "is not a means by which a defendant can relitigate issues already decided"]; *People v. DeHuff* (2021) 63 Cal.App.5th 428, 438 [section 1172.6 "does not permit a petitioner to establish eligibility on the basis of alleged trial error"].) In his direct appeal, Young never challenged the sufficiency of evidence for his conviction, asserting only instructional and sentencing errors. To the extent Young's current contentions seek to relitigate the evidence from his 2011 jury trial to challenge the validity of his original convictions or to raise due process concerns which were never raised in his direct appeal and which have no bearing on section 1172.6 relief, we decline to consider them at this juncture.[3]

---

[3]  Among these contentions is Young's argument that the prosecution did not sustain its burden of proof because it was not proven whether the shots fired from his firearm or Myers' firearm resulted in White's death. We note that "it has long been recognized that there may be multiple proximate causes of a homicide, even where there is only one known actual or direct cause of death." (*People v. Sanchez* (2001) 26 Cal.4th 834, 846 (*Sanchez*).) In *Sanchez*, it was not established whether Sanchez or a rival gang member had fired the fatal shot that killed an innocent bystander. (*Id.* at pp. 838, 845.) The Supreme Court explained that " ' "[t]here may be more than one proximate cause of death. When the conduct of two or more persons *contributes concurrently as the proximate cause of death*, the conduct of each is a proximate cause of the death if that conduct was also a substantial factor contributing to the result." ' " (*Id.* at p. 847.) The Court concluded: "Although

## B. Sufficient Evidence Supported the Trial Court's Finding of Second Degree Implied Malice Murder

Young's challenges to the sufficiency of the evidence in support of the trial court's finding of second degree implied malice murder are not persuasive. Based on the evidence from the 2011 trial, the People had proven beyond a reasonable doubt every element of the crime of second degree implied malice murder. And even with the changes to section 188 and 189, Young would still be found guilty of this crime.

"[S]econd degree murder . . . is 'the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.] Malice may be either express (as when a defendant manifests a deliberate intention to take away the life of a fellow creature) or implied. [Citation.] 'Malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507; *People v. Landry* (2016) 2 Cal.5th 52, 96 ["A finding of express malice requires evidence of an intent to kill, whereas a finding of implied malice

_____

in this case it could not be determined who was the direct or actual shooter of the single fatal round, the evidence, with all reasonable inferences drawn in favor of the guilty verdicts, supports a finding that [Sanchez's] commission of life-threatening deadly acts in connection with his attempt on Gonzalez's life was a substantial concurrent, and hence proximate, cause of [the victim's] death." (*Id.* at pp. 848–849.) Here, too, the absence of evidence regarding whether Young or Myers fired the fatal shot would not be grounds for reversing Young's conviction.

requires only an 'intent to do an act dangerous to human life with conscious disregard of its danger.' "].)

" '[S]econd degree murder based on implied malice has been committed when a person does " ' "an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life" ' " ' [Citations.] 'The concept of implied malice has both a physical and a mental component. [Citation.] The physical component is satisfied by the performance of " 'an act, the natural consequences of which are dangerous to life.' " [Citation.] The mental component . . . involves an act " 'deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' ' " [Citations.] " 'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.' " ' " (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 512.) " 'It is unnecessary that implied malice be proven by an admission or other direct evidence of the defendant's mental state; like all other elements of a crime, implied malice may be proven by circumstantial evidence.' " (*Ibid.*)

The amendments forged by SB 1437 maintained the viability of murder convictions based on implied malice and did not alter the definition of implied malice murder. (*People v. Reyes* (2023) 14 Cal.5th 981, 988–991 [implied malice remains a valid theory of second degree murder even after the changes to the law that section 1172.6 implements]; *People v. Clements* (2022) 75 Cal.App.5th 276, 298 (*Clements*) [SB 1437 amendments maintained viability of murder convictions based on implied malice].)

"We review the trial judge's fact finding for substantial evidence. [Citation.] We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' [Citation.] Our job on review is different from the trial judge's job in deciding the petition. While the trial judge must review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard, our job is to determine whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Clements*, *supra*, 75 Cal.App.5th at p. 298.)

Here, the trial judge found the evidence supported Young's second degree murder verdict under an implied malice theory. We conclude there was sufficient evidence to support its finding as the record contains substantial evidence that Young's act of shooting into White's car was deliberate and done with a conscious disregard of human life. There was evidence that Young brought an AK-47 assault rifle into Sheppard's car as Sheppard testified that he carried a long duffle into her vehicle, while Myers entered the car empty-handed. Sheppard also testified that when she fled the crime scene, she had seen an object slung over his shoulder that looked to be a pole and was consistent with the barrel of a rifle. Detective Pistello's testimony corroborated this report. The detective also testified that based on C.'s description of how Myers used his firearm, it was clear to him Myers had a handgun and not a rifle. The trial court as fact finder could have reasonably concluded Young had stowed a rifle in his duffle where it was

21

easily accessible in the back seat, and he retrieved and used the rifle during the shootout.

The physical evidence inside Sheppard's Dodge and of White's damaged Pontiac also supports the trial court's implied malice finding. Detective Pistello testified he saw an expended 7.62x39mm rifle shell casing when he peered inside the Dodge. Deputy Finley explained he uncovered fourteen expended 7.62x39mm cartridge cases likely fired from an AK-47 inside the passenger compartment of the vehicle, including one inside Young's unzipped duffle bag. White's Pontiac suffered concentrated bullet damage with blown out windows and 13 bullet holes in the passenger side doors. Fragments of bullets from a rifle were also found inside the Pontiac and removed from D.'s body during surgery. There was also no evidence that anyone in the Pontiac had weapons or displayed any threatening conduct towards the Dodge. Hence, the trial court as fact finder could have reasonably concluded Young, unprovoked, fired at least 12 rounds of an assault rifle towards a passenger vehicle on a freeway, targeting the passengers in the vehicle. This provides a sufficient basis for the trial judge's finding beyond a reasonable doubt that Young deliberately shot an assault rifle from one moving car at another moving car on a freeway and acted in conscious disregard of human life.

### D.     No Further Independent Review is Required.

We are not otherwise required to conduct an independent review of the record in an appeal from an order denying a petition for resentencing filed pursuant to section 1172.6 and we decline to do so. (*Delgadillo*, *supra*, 14 Cal.5th at p. 226.)

### DISPOSITION

The order denying Young's section 1172.6 resentencing petition is affirmed.

_____

Petrou, J.

WE CONCUR:


_____

Tucher, P.J.


_____

Rodríguez, J.

A164845/*People v. Young*